IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| MARY MAKUPSON, | Civil Action No. 3:08-3587-TLW-JRM |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

On August 8, 2005, Plaintiff applied for DIB, alleging disability as of August 19, 2003.[1] Plaintiff's application was denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). After a hearing held January 19, 2007, at which Plaintiff appeared and testified, the ALJ denied Plaintiff's claim in a decision issued June 14, 2007. The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act because, under the medical-vocational guidelines promulgated by the Commissioner (also known as the "grids"), Plaintiff remains able to perform work found in the national economy. See generally 20 C.F.R., Part 404, Subpart P, Appendix 2.

---

[1] At the hearing, Plaintiff amended her onset date to August 1, 2004.

Plaintiff was fifty-eight years old as of the date of the ALJ's decision. She has a high school education and past relevant work experience as a mold operator (Tr. 33, 116). Plaintiff alleges disability due to bladder incontinence (Tr. 67).

The ALJ found (Tr. 18-24):

1. The claimant meets the insured status requirements for the Social Security Act through June 30, 2009.

2. The claimant has not engaged in substantial gainful activity since August 1, 2004, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et. seq.*).

3. The claimant has the following severe impairment: a leaky bladder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work with no limitations except that due to bladder leakage, she would need to change her protective pads twice over the course of an eight-hour day.

6. The claimant is unable to perform any past relevant work (20 CFR 404.l565).

7. The claimant, born on June 26, 1949, was 54 years old on her alleged disability onset date. She was therefore in the "closely approaching advanced age" category. On June 26, 2004, her 55th birthday, she entered the "advanced age" category. She is currently less than three weeks from her 58th birthday (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2004, through the date of this decision (20 CFR 404.1520(g)).

On October 3, 2008, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final action of the Commissioner. Plaintiff then filed this action in the United States District Court on October 23, 2008.

## **STANDARD OF REVIEW**

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence.[2]  Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

---

[2]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and <u>Blalock v. Richardson</u>, supra.

## MEDICAL EVIDENCE

Plaintiff underwent a hysterectomy in September 2000 (Tr. 224). In October 2000, Plaintiff complained to Dr. Elizabeth W. Bozeman, a urologist, of not being able to empty her bladder to completion and having a bloated feeling in her lower abdomen. Plaintiff reported that she was able to "hold her urine for several hours without difficulty" and denied any stress incontinence or nocturia (the need to get up during the night to urinate). A scout film indicated that Plaintiff was emptying her bladder to completion; a bladder scan revealed no residual post voiding; and an intravenous pyelogram ("IVP") revealed normal upper tracts, no evidence of any ureteral dilation, and that both ureters entered the bladder normally. Dr. Bozeman advised Plaintiff that, if the sensation of incomplete emptying persisted, it was most likely due to her recent abdominal surgery (Tr. 235, 237).

Dr. J. Brian Fowler began treating Plaintiff in February 2001 (Tr. 268-269). During 2001 and 2002 he treated Plaintiff for various complaints including cough, sinus infection, and bronchitis, but there is no mention of any complaints of incontinence (Tr. 261-269). On June 2, 2003, he noted that Plaintiff complained of some bladder issues including incontinence multiple times during the day and difficulty at times "getting the stream started." Dr. Fowler prescribed Detrol LA (Tr. 260).

On July 23, 2003, Plaintiff told Dr. Bozeman that her incontinence had been terrible in the past month, she had to wear pads twenty-four hours a day, and Detrol LA had not helped her condition. She stated that she worked twelve-hour shifts, could not go to the bathroom during her shift, and her lower back hurt if her bladder was full. Plaintiff stated that she had bronchitis and when she coughed the leaks were "bad" (Tr. 231). Records from Dr. Bozeman in August 2003 reveal

4

that Plaintiff emptied her bladder well, she had good sensation, she had excellent uroflow, and the detrusor muscle of her bladder demonstrated good compliance and a large capacity for urine retention. Plaintiff demonstrated weak Kegel exercises, but it was noted that she did not using her abdominal muscles. Dr. Bozeman thought that Plaintiff could benefit from E-stim, Kegel exercises, and vaginal weights (Tr. 165-175) During her first therapy session, Plaintiff reported that she usually used only one pad for incontinence and seldom experienced nocturia. Plaintiff cancelled the therapy after three sessions, stating she lost her health insurance (Tr. 164).

From September 2003 until her alleged onset of disability date, Plaintiff sought medical treatment with Dr. Fowler on at least three occasions (September 9, 2003, March 24, 2004, and May 27, 2004), but the medical records do not reflect that she requested treatment for incontinence on any of these occasions (Tr. 177-178, 218). Dr. Rick K. Jotani, of the Spartanburg Regional Healthcare System ("SRHS"), examined Plaintiff on November 4, 2004. Plaintiff complained of urine leaking after excessive coughing. Dr. Jotani diagnosed gastroesophageal reflex disease, benign hypertension, and hypercholesterolemia. He did not diagnose incontinence. He referred Plaintiff for financial assistance for her cholesterol medication (Tr. 256-257). No complaints of incontinence were noted during a routine check up on February 8, 2005, at which Plaintiff reported she was doing ok for the most part (Tr. 245-247).

On October 24, 2005, Plaintiff told Dr. Michael S. Schmidt of the SRHC that whenever she sneezed, coughed, or lifted something she lost a little urine. Dr. Schmidt noted that Plaintiff's abdomen was nontender and her urethra and bladder were "normal." He diagnosed Plaintiff with benign hypertension and fibrocystic breast disease. Dr. Schmidt's diagnoses also included a "minor"

5

diagnosis of female stress incontinence, but he did not prescribe any treatment for the condition or place any limitations on her (Tr. 238-240).

On November 8, 2005, Dr. Husam Mourtada performed a consultative examination. Plaintiff reported bladder stress incontinence with coughing, sneezing, and lifting. Dr. Mourtada's assessment included bladder stress incontinence, but he did not note any functional limitations as a result of the impairment (Tr. 219-221).

Dr. Fowler examined Plaintiff again on December 12, 2005. He referenced Plaintiff's incontinence, but did not place any limitations on Plaintiff resulting from the impairment or prescribe any treatment for incontinence, apart from stating "[o]ther issues pertinent to her disability are discussed above" (Tr. 258). On April 18, 2006, Dr. Fowler completed a questionnaire from Plaintiff's counsel regarding Plaintiff's functional capabilities. (Tr. 281-282). Dr. Fowler opined that Plaintiff could not carry more than ten pounds, could not stand for prolonged periods on concrete, was "unable" to lift boxes, and had to leave her work station frequently for bathroom breaks. He also indicated that "pushing and pulling cause incontinence," and stated that the limitations began in 2003 (Tr. 281-282).

## **HEARING TESTIMONY**

Plaintiff testified that as a mold operator she stood on her feet for her entire twelve-hour shift and lifted objects weighing seventy-five pounds or more. She received two ten-minute breaks and a twenty-four-minute lunch during each twelve-hour shift (Tr. 40, 42, 67, 71-72). Plaintiff reported that she lost her job as a mold operator in August 2003 because she had been out of work a lot caring for her disabled husband (see Tr. 36-38). After her job was terminated, Plaintiff applied for unemployment benefits (certifying that she was physically able to work and was searching for work)

and received unemployment compensation for about one year (Tr. 38). She testified that since 2003 she has worked as a janitor at her church for one to two hours a week, straightening up the church before services (including dusting, cleaning the bathroom, and vacuuming). She complained that she experienced incontinence when vacuuming or getting down under the pews (Tr. 35).

Plaintiff stated that she experienced bladder problems right after her hysterectomy and the problem had gotten "a little worse" over time (Tr. 46). She testified that coughing, sneezing, laughing, or bending down and lifting heavy objects made her symptoms worse (Tr. 48). She reported no physical limitations on lifting, but stated she experienced incontinence as a consequence of lifting (Tr. 49). Plaintiff testified that she experienced incontinence when standing, sitting, or lying down (Tr 49–50). She stated that if she was standing or walking for most of the day she "sometimes" soiled her clothes with urine, "[e]specially if I have a cold or [have been] coughing." (Tr. 57-58). She said that she might not leak when picking up light objects (weighing ten or twenty pounds), but she would leak as she went about her day. She said she had to change her Serenity pad twice in an eight-hour day (Tr. 58-59). She responded "yes" to a question of whether there would be a substantial chance that she would soil her clothes with urine when lifting objects weighing "fifty pounds or whatever." (Tr. 60). Plaintiff said that she soiled her clothes with urine while working as a mold operator and that during a twelve-hour shift she changed her Serenity pad five or six times and also changes her underclothes and pants (Tr. 61-62, 71-72). Plaintiff thought she would experience the same problems when lifting objects weighing more than twenty pounds that she experienced while working as a mold operator (Tr. 63).

Plaintiff said that she got up twice during the night to use the bathroom and used the bathroom before going to bed and after getting up in the morning (Tr. 51). She said she took Detrol

7

LA for bladder control in the past, but had been out of the medication for two or three weeks, because she did not have money to refill her prescription (Tr 45-46). She said that the medication did not help, because it suppressed the feeling that she needed to go to the bathroom, but did not prevent leakage (Tr. 45). With the medication, she urinated about two or three times an hour. Plaintiff testified that she sometimes experienced pain in her lower back in relation to her bladder impairment and stated that, at times, the pain was a five out of ten without medication and two or three out of ten with medication (Tr. 47). When asked if she had pursued any sort of physical therapy or assistive devices, Plaintiff testified that she lacked insurance and could not pay. She said she had not asked her family doctor for a referral for free treatment (Tr. 52-53).

## **VOCATIONAL EXPERT EVIDENCE**

At the hearing, the ALJ submitted an interrogatory to a vocational expert ("VE"), Mr. G. Roy Sumpter. The ALJ asked the VE to consider whether an employer would tolerate an unskilled employee who needed to go to the bathroom (for approximately five minutes on each occasion) three to four times during an eight-hour workday with the breaks evenly spaced throughout the working day (e.g. one every two hours). In response, the VE wrote that an employee would normally have a morning break, a lunch break, and an afternoon break, and that if she could visit the bathroom during these breaks, and took an occasional fourth break, she would be able to complete her job responsibilities. The VE stated, however, that if an employee needed to take evenly spaced breaks at two hours intervals throughout the day, she would not be able to perform work as it is normally performed in the national economy because the breaks would not coincide with regularly scheduled breaks (Tr. 158-159).

8

On March 2007, Karl S. Weldon, MA, CVE, CCM, completed a questionnaire at the request of Plaintiff's counsel. Mr. Weldon was asked to consider a fifty-six year old woman with a twelfth grade education and experience as a mold operator (including lifting up to seventy pounds) who, if she performed medium work, would "gradually leak urine" while standing, walking and lifting, until she fills up and has to change adult diapers about two times per eight hour shift, and additionally that she would soil her pants with urine about one time a day. Plaintiff's counsel asked Mr. Weldon whether the hypothetical individual would be able to perform anything more than light work. Mr. Weldon wrote, "No, she would not." (Tr. 160).

## **DISCUSSION**

Plaintiff alleges that the ALJ: (1) failed to properly assess her residual functional capacity ("RFC"); (2) erred in relying on the grids; (3) applied the wrong legal standard to deny benefits; and (4) failed to properly evaluate her credibility. The Commissioner contends that the ALJ's decision is supported by substantial evidence and free of legal error.

### A. **RFC**

Plaintiff claims that the ALJ failed to properly assess her RFC. Specifically, she claims that the ALJ erred in finding that the only restriction (from her bladder impairment) that she had on her ability to work was that she would only need to change her protective pads twice over the course of an eight-hour day if she performed medium work. She appears to argue that the ALJ erred in not finding that she would need to change her clothes once during the workday because she soiled them. The Commissioner contends that substantial evidence supports the ALJ's findings.

The ALJ's determination concerning Plaintiff's RFC is supported by substantial evidence and is correct under controlling law. The ALJ specifically considered the medical evidence and

non-medical evidence (including her testimony) in determining her RFC. With the exception of Dr. Fowler's April 2006 responses to the questionnaire of Plaintiff's counsel,[3] none of Plaintiff's treating or examining physicians found that she was disabled or placed any restrictions on her ability to perform work. See Lee v. Sullivan, 945 F.2d 687, 693 (4th Cir. 1991)(finding that no physician opined that claimant was totally and permanently disabled supported a finding of no disability). Plaintiff testified that her doctors had not put any restrictions on her (see Tr. 53-54).

Plaintiff did not leave her prior heavy job because of her impairment, but left for reasons (although unfortunate) other than her own impairment. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993)(finding that the fact that the claimant stopped working for reasons other than his physical impairment provided substantial evidence in support of the ALJ's finding that the claimant was not disabled). Here, the ALJ restricted Plaintiff to medium work instead of the heavy work of her past relevant work (which she able to perform despite her impairment). Plaintiff testified only that her condition had gotten "a little worse" over time (Tr. 46). See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)(claimant who worked with impairments over a period of years without any worsening of condition was not entitled to disability benefits); Cauthen v. Finch, 426 F.2d 891, 892 (4th Cir. 1972)(finding claimant was not disabled where she had eye problems of long standing, worked regularly for years despite the problem, and had no significant deterioration). As also noted by the ALJ, when Plaintiff applied for unemployment benefits after being fired in August 2003, she certified that she was physically able to work, and the record did not reflect that her condition worsened after that time period (Tr. 22). See Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991)(nothing that

---

[3]Plaintiff has not challenged that the ALJ properly discounted this opinion as it was not supported by the evidence.

the claimant's application for unemployment benefits weighed against finding that he was unable to work). The ALJ also found that Plaintiff's RFC was not as restrictive as she testified to, as discussed further below.

### B. <u>Proper Legal Standard</u>

Plaintiff contends that the ALJ applied an improper legal standard to determine that she was not disabled. Specifically, she claims that the ALJ, relying on Plaintiff's testimony that she worked one to two hours a week as a church janitor, concluded that Plaintiff was not disabled because she was "not totally incapacitated by her urinary incontinence problems" (Tr. 22). The Commissioner contends that the ALJ did not apply an improper legal standard and that Plaintiff has taken this statement out of context.

Contrary to Plaintiff's argument, the ALJ applied the proper legal standard in determining that Plaintiff was not disabled. He specifically considered the medical and non-medical evidence in determining that she was capable of performing medium work despite her impairments. Although the ALJ found that Plaintiff's part-time janitor job supported a finding that she was not totally incapacitated, his decision that she was not disabled was not based on a finding that she was not totally incapacitated or made simply because she could work part-time. Under the regulations, the ALJ's consideration of Plaintiff's part-time work is proper. <u>See</u> 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."

11

### C. Grids/VE

Plaintiff asserts that the ALJ erred in relying on the grids to meet his burden at step five[4] of the sequential evaluation process. Specifically, she argues that the ALJ could not rely on the grids because she has the nonexertional impairment of bladder incontinence. Plaintiff also argues that the ALJ erred in evaluating the information from the VEs because he ignored Dr. Weldon's opinion and disregarded Dr. Sumpter's conclusions. The Commissioner contends that the ALJ properly relied on the grids because he found that Plaintiff had the RFC to perform a full range of medium work; found that Plaintiff's incontinence was a nonexertional impairment; found that Plaintiff would need to change her protective pads only twice over the course of an eight hour day; and noted that an employee will normally have a morning break, a lunch break, and an afternoon break.

When a claimant: (1) suffers from a nonexertional impairment that restricts his ability to perform work of which he is exertionally capable, or (2) suffers an exertional impairment which restricts him from performing the full range of activity covered by a work category, the ALJ may not rely on the grids and must produce specific vocational evidence showing that the national economy offers employment opportunities to the claimant. See Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989); Hammond v. Heckler, 765 F.2d 424, 425-26 (4th Cir. 1985); Cook v. Chater, 901 F. Supp. 971 (D.Md. 1995). A nonexertional impairment is an impairment which is present whether the

---

[4]In evaluating whether a claimant is entitled to disability insurance benefits, the ALJ must follow the five-step sequential evaluation of disability set forth in the Social Security regulations. See 20 C.F.R. § 404.1520. The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy. See id.

claimant is attempting to perform the physical requirements of the job or not. See Gory v. Schweiker, 712 F.2d 929 (4th Cir. 1983); see also 20 C.F.R. § 404.1569a. Every nonexertional condition does not, however, rise to the level of a nonexertional impairment. The proper inquiry is whether there is substantial evidence to support the finding that the nonexertional condition affects an individual's residual capacity to perform work of which he is exertionally capable. Walker, 889 F.2d at 49; Smith v. Schweiker, 719 F.2d 723, 725 (4th Cir. 1984).

The ALJ did not err on relying on the grids to determine that there were jobs that exist in significant numbers in the national economy that Plaintiff can perform despite her impairment. Here, the ALJ found that Plaintiff's ability to perform the full range of medium work was not affected by her incontinence. The ALJ found that Plaintiff's severe impairment of urinary incontinence would require her to change her incontinence pads twice during an eight-hour workday. There is no indication that she could not take bathroom breaks and change her pads on the breaks an employee normally is allowed.[5]

Plaintiff, citing Rambo v. Heckler, 728 F.2d 1583, 1583-84 (11th Cir. 1984); Gonzalez v. Sullivan, 914 F.2d 1197, 1202 (9th Cir. 1990); Haynes v. Heckler, 716 F.2d 483, 485 (8th Cir. 1983); and Mac v. Sullivan, 811 F.Supp. 194, 199 (E.D.Pa. 1993), argues that this court should find that VE testimony is required because other courts have uniformly found that incontinence requires VE testimony. These cases, however, are distinguishable. In Rambo, the Eleventh Circuit, noting that the government conceded the ALJ erred in his finding on the severity of the claimant's chronic diarrhea and erred in applying the grids to the nonexertional impairment, stated that " the grids do

---

[5]The ALJ found (and Mr. Sumpter noted -Tr. 158) that an employee normally has a morning break, a lunch break, and an afternoon break.

not apply when a claimant suffers from a nonexertional impairment that affects her ability to perform a wide range of work at the designated RFC..." Rambo, 728 F.2d at 1583-1584. Here, however, the ALJ found that Plaintiff's incontinence did not affect her ability to perform a wide range of medium work. In Haynes, the claimant's impairment was colon discomfort and recurrent episodes of diarrhea rather than urinary incontinence, and these impairments were found to be nonexertional because they had nothing to do with physical exertion. Haynes, 716 F.2d at 485. In this action, Plaintiff testified that lifting exacerbated her condition. In Gonzalez, the Ninth Circuit remanded the case for VE testimony because the ALJ did not explain how the claimant's incontinence urinary incontinence affected his ability to work or whether the incontinence constituted a nonexertional limitation. Gonzalez, 914 F.2d at 1202. Here, the ALJ specifically discussed how incontinence affected Plaintiff's ability to work. In Mac, the district judge noted that the ALJ did not make any specific findings concerning the claimant's incontinence (unlike here). See Mac, 811 F.Supp. at 199. The Fourth Circuit, however, has not addressed the issue of whether incontinence mandates the use of vocational testimony. Based on the law set out in applicable Fourth Circuit cases, see Walker v. Bowen, 889 F.2d at 49 and Smith v. Schweiker, 719 F.2d at 725, the ALJ did not err in not obtaining VE testimony where he found that Plaintiff's ability to perform medium work was not reduced by her incontinence.

Although the ALJ did not specifically discuss Mr. Weldon's response to the written question of Plaintiff's counsel, he did specifically state that he considered all of the evidence in reaching his decision (See Tr. 16, 18, and 19). Further, any error as to a failure to discuss Mr. Weldon's opinion is harmless, as the issue of RFC is one that is ultimately reserved to the Commissioner (see 20 C.F.R. § 404.1546(c) and SSR 96-5p) and his response was not relevant to the ALJ's determination as his

14

testimony pertained to a more restrictive RFC than the one found by the ALJ. The ALJ properly discounted Mr. Sumpter's testimony as pertaining to a more restrictive RFC than he found (Tr. 24).

**D.     Credibility**

Plaintiff alleges that the ALJ erred in discounting Plaintiff's symptoms without considering her inability to afford treatment. The Commissioner contends that the ALJ properly considered Plaintiff's credibility, including addressing her inability to afford treatment.

In assessing credibility and complaints of pain, the ALJ must: (1) determine whether there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints of pain, along with all of the evidence in the record. See Craig v. Chater, 76 F.3d 585, 591-92 (4th Cir. 1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994). Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges he suffers. A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

Plaintiff appears to argue that the ALJ erred in failing to credit her testimony that not only would she need to change her pad two times a day during an eight-hour workday if she performed medium work, but that she would also need to change her clothes once a day. The ALJ, however, was not required to credit Plaintiff's assertion that she would experience the same symptoms when

15

performing medium work for eight hours a day, five days per week that she experienced when performing her past relevant heavy work in twelve-hour shifts. Plaintiff testified that she would only change her pad twice a day if she was doing light work (see Tr. 58-59). Plaintiff speculated that she would soil her clothes if she was lifting over twenty pounds, but the ALJ discounted her testimony based on a proper credibility analysis.

The ALJ's decision to discount Plaintiff's credibility is supported by substantial evidence. He properly considered the medical and non-medical evidence in assessing her credibility. The ALJ noted that Plaintiff infrequently sought treatment for her urinary incontinence, and that the treatment she received was conservative (see Tr. 20). His opinion is also supported by her daily activities which included driving, shopping, taking herself and her husband to doctor's appointments, cleaning her home, cooking, visiting with family, going to church, and working part-time (Tr. 34-35, 51-52). Plaintiff argues that the ALJ impermissibly discounted her credibility based on her infrequency of treatment in this case because she was unable to afford treatment. The ALJ, however, specifically questioned her at the hearing about her inability to afford treatment and Plaintiff stated that she had not asked her physicians about getting referrals for free specialty treatment (Tr. 53). On at least one occasion, a health care provider referred Plaintiff to sources to provide financial assistance for a different impairment (Tr. 256). Plaintiff, despite her financial problems, sought treatment for other complaints and records of those visits often reveal that she did not complain about incontinence or ask for any treatment of this allegedly disabling condition. Additionally, any error as to the ALJ's discussion about Plaintiff's credibility based on her inability to afford treatment is harmless, as the ALJ discounted Plaintiff's credibility for numerous other reasons, as discussed above.

**CONCLUSION**

Despite Plaintiff's claims, she fails to show that the Commissioner's decision was not based on substantial evidence or was not correct under controlling law. This Court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson v. Perales, supra. Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock v. Richardson, supra. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively v. Heckler, supra. It is, therefore,

RECOMMENDED that the Commissioner's decision be **affirmed**.

_____
Joseph R. McCrorey
United States Magistrate Judge

March 1, 2010
Columbia, South Carolina